IN THE UNITED STATES DISTRICT COURT

CENTRAL DIVISION, DISTRICT OF UTAH

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:05-CR-321 DB |
| Plaintiff, | : | |
| | | REPORT AND RECOMMENDATION |
| vs. | : | |
| QUENTIN LEE STEWART, | : | JUDGE DEE BENSON |
| Defendant. | | MAGISTRATE JUDGE BROOKE C. WELLS |

Defendant, Quentin Stewart, seeks to suppress evidence seized as a result of a search and the statements he made during subsequent interviews.  After considering the evidence before the court, relevant case law and the parties' respective memoranda, the court recommends that Stewart's Motion to Suppress be DENIED.[1]

The court finds that exigent circumstances justified the officers' no knock entry into the trailer where Stewart was located.  The court further finds that the officers had reasonable suspicion that Defendant was engaged in criminal activity.  Therefore, pursuant to Stewart's probation agreement the officers were justified in searching Defendant's room.

---

[1] The court received the transcripts from final argument on April 24, 2006 and proceeded to take the motion under advisement.

Finally, the court finds that Defendant sought contact with the police after invoking his fifth amendment rights.  The conversations with Agent Almgren, therefore, should not be suppressed.

### FACTUAL BACKGROUND

On August 24, 2004 Stewart was placed on probation with Adult Probation and Parole (AP&P) and entered into a probation agreement.  The agreement states, *inter alia*, that Stewart will not possess, have under control, in possession or on the premises where he resides, any weapons.[2]  The agreement also permits AP&P officers to "search my person, residence, vehicle or any other property under my control without a warrant at any time, day or night upon reasonable suspicion to ensure compliance with the conditions of the Probation Agreement."[3]

On April 29, 2005 a state court issued an arrest warrant for Stewart based on alleged probation violations.  (Tr. 10).[4]  On this same date, six law enforcement officers including Deputy United States Marshall Ty Harris and AP&P Agents Carl Kennington and Hank Haurand, went to the trailer where Defendant was staying to arrest him on the outstanding warrant.  (Tr. 10-12).  Prior to approaching the trailer, the officers knew that Defendant was on probation, that another probationer was living in the trailer,

---

[2]  *See* Probation Agreement, Pla.'s Ex. 1.

[3]  *Id.*

[4]  Tr. designates the transcript from a hearing before this court held on January 11, 2006.  Tr.2 designates the transcript from a hearing held on March 20, 2006.

and that Defendant's arrest warrant was for possession of a
firearm.  (Tr. 10, 15, 51).  The police intended to knock and
announce their presence and then request entry to take Defendant
into custody.  (Tr. 12-13).  As the officers drove up to the
trailer a vehicle left.  Two Kaysville City Police Officers got
into their vehicle and eventually stopped the vehicle that left
the trailer.  (Tr 12).

Two officers were assigned to watch the back of the trailer
while the remaining four officers were to approach the front
door.  (Tr. 12).  The four officers approaching the front door
formed a line with Agent Haurand positioned at the front and
Marshall Ty Harris in the rear.  (Tr. 12-13).  As the officers
walked up the stairs toward the front door, Agent Haurand heard
someone from inside the trailer yell, "police" and saw an
individual run to the back of the trailer.  (Tr. 53).  The other
officers in the front of the trailer also heard someone "call out
from inside the trailer" and heard running and scuffling inside
the trailer.  (Tr. 13).

At approximately this same time, Agent Kennington, who was
located in the back of the trailer with Marshal Dean Knightly,
saw someone open a rear window as if they were going to climb out
and attempt to exit.  (Tr. 36).  But, upon seeing Kennington and
Knightly the individual went "back in."  (Tr. 36).  Shortly
thereafter, a small bag came out of another window.  The officers
retrieved it and found that it contained marijuana.  (Tr. 37).
Knightly called on his Nextel to inform the officers in the front

of the house what was happening.  (Tr. 37).  Kennington heard the
officers in the front of the trailer yelling.  (Tr. 38).

Deputy Harris received the call from Deputy Knightly.
Harris was told that things were being thrown out the back
window.  (Tr. 13, 58).  Agent Haurand, who was the officer at the
front of the line, also heard the information being relayed from
the rear of the trailer.  (Tr. 13, 58).

Haurand grabbed the door knob and found the door unlocked so
he opened it.  (Tr. 17).  As the police were entering the trailer
they were yelling, "police."  Haurand testified that he entered
the trailer immediately to "make sure that everyone is safe
inside and that there's no evidence being destroyed, that no one
can make movements towards any type of weapons that might be used
against us in performing our duties."  (Tr. 54).

After the trailer was secured, the Kaysville City officers
returned with the individual who was driving the vehicle that
drove away from the trailer.  (Tr. 25-27, 31-32).  Blake Peterson
was the vehicle's occupant.  He was interviewed in the street in
front of the trailer and told officers that there were weapons
inside.  (Tr. 30-31).  Deputy Harris testified that Peterson
specifically stated that he had seen Defendant with a firearm
approximately a week before.  (Tr. 27-32).

Following the interview, Deputies Harris and Knightly
searched Defendant's room, the northeast back bedroom of the
trailer.  (Tr. 22, 87).  At some point in time before the search
Ms. Cynthia Blair, another occupant of the trailer, gave consent

4

to specifically search this room.  (Tr. 22-23).  Ms. Blair's adult son resided with Defendant in this room.  (Tr. 23).  Three firearms were found in Defendant's bedroom, including the revolver that he is charged with possessing in the instant case. (Tr. 22, 88).  During questioning at the scene Defendant invoked his right to remain silent and right to counsel.  (Tr. 70, 91). Defendant was arrested and taken to the Davis County Jail.

The following day Deputy Harris called Project Safe Neighborhoods Task Force Agent Robert Almgren to take over Defendant's case because of the alleged firearm violation.  (Tr. 66-67).  Harris informed Almgren that Defendant had invoked his right to counsel.  (Tr. 70).  On May 3rd, Agent Almgren allegedly received a call from a deputy at the Davis County Jail stating that Defendant wanted to speak with an officer about his case. (Tr. 67-70).  Almgren could not identify the name of the deputy that called him.  (Tr. 67).  But, according to Almgren, the officer at the jail knew to call him based on prior contact with jail employees during presentations about Project Safe Neighborhoods.  (Tr. 67).

On May 3rd Almgren went to the jail to interview Defendant. (Tr. 67-68).  Prior to beginning the interview, Almgren told Defendant that he was there at Defendant's request and asked Defendant if it was his intention to speak with him although he had invoked his right to counsel.  (Tr. 69).  Defendant told Almgren that he wanted to "speak with the officers that arrested him that night."  (Tr. 69).  Almgren told Defendant that the case

had now been assigned to him.  (Tr. 69).  Almgren read Defendant

his *Miranda* warnings and began the interview by asking Defendant

what he wanted to talk about.  (Tr. 69-71).  Defendant admitted

to attempting to conceal the firearm but denied any ownership of

it.  Defendant stated that it belonged to one of the other

individuals in the trailer.  (Tr. 73).  Defendant then asked

Almgren to follow up with the other people in the trailer and

determine who owned the firearm.  (Tr. 73).  Defendant requested

that Almgren return to the jail to speak with him again after

completing his investigation.  (Tr. 73).  Agent Almgren attempted

to tape record the first interview but accidently left the hold

button depressed during the entire interview.  (Tr. 72).

On May 9th, Agent Almgren returned to the jail to speak with

Stewart again.  (Tr. 74).  He began the interview by asking

Stewart whether he had requested him to come.  (Tr. 99).

Defendant responded, "yea."  (Gov. Ex. #2).  Almgren then read

Defendant his *Miranda* warnings again and Defendant agreed to talk

with him.  (*Id.*)  During the second interview Defendant admitted

to possessing the firearm and specifically identified the .38

caliber revolver as the firearm he picked up.  (*Id.*).

Stewart's testimony partially contradicts that offered by

Agent Almgren.  Defendant testified that he did not request

anyone to come and talk to him initially.  (Tr. 99).  But,

Defendant does admit that he wanted to speak with the officers

that were there the night he was arrested.  (Tr. 99).  And,

Stewart also admits that he did request Agent Almgren return for

the second interview.  (Tr. 99).

Stewart further testified about a system used at the jail
when an inmate has a request to see an officer, lawyer, or obtain
some property.  An inmate must fill out a request slip that is
called a "kite."  (Tr. 93).  According to Stewart, all requests
must be made through a kite in writing and "if you go through it
the other way there's a lot of hearsay that goes on."  (Tr. 94).
There is no evidence of a kite or request before the court.


### DISCUSSION

Stewart argues that the "search of the bedroom within the
trailer home was unlawful because it was not based upon
consent."[5]  Stewart further asserts that the "interrogations
occurring at the Davis County Jail must be suppressed because
they were initiated by law enforcement after [D]efendant had
invoked his right to counsel."[6]

At the outset the court wishes to address Stewart's request
that this court determine whether probationers waive all their
Fourth Amendment rights by signing an agreement with a search
clause.  This question was left open by the Supreme Court in
*United States v. Knights*.[7]  Stewart cites to the court a series

---

[5]   Mem. in Supp. p. 2.

[6]   *Id.*

[7]   534 U.S. 112, 118, 120 n. 6, 122 S.Ct. 587 (2001) ("We do
not decide whether the probation condition so diminished, or
completely eliminated, Knights' reasonable expectation of privacy
. . . that a search by a law enforcement officer without any
individualized suspicion would have satisfied the reasonableness

of cases which focus on this issue.   Not surprisingly, there are competing schools of thought.  Some courts have held that probationers waive their Fourth Amendment rights.[8]  Other courts have held that probation agreements are narrowly construed and that any ambiguity will be resolved against the government.  In essence a probationer does not give up all their Fourth Amendment rights.[9]

The court finds it unnecessary to engage in this analysis and declines to determine whether Stewart as a probationer has relinquished all his Fourth Amendment rights.  As outlined below, the court finds that the search in this case was supported by reasonable suspicion.  Therefore, based on Defendant's probation agreement and reasonable suspicion, the court "need not address the constitutionality of a suspicionless search."[10]  Further, any knock and announce requirement that may have existed was nullified by the exigent circumstances which arose as the officers approached the trailer.

---

requirement of the Fourth Amendment.").

[8]   *See* *U.S. v. Burnett*, 415 F.3d 690 (7th Cir. 2005) (holding that the defendant's blanket waiver of Fourth Amendment rights which was part of a plea agreement permitted search of the defendant's home).

[9]   *See* *People v. Lampitok*, 207 Ill.2d 231, 253 (2003) (concluding that an officer cannot rely solely on the search provision in a probation agreement but instead, must have reasonable suspicion of a probation violation).

[10]   *Knights*, 534 U.S. 112, 120 n. 6.

## I.  Entry and Search of the Trailer

A. Entry

"[T]he Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry."[11]  This procedure is codified in 18 U.S.C. § 3109.  And it applies when law enforcement officers seek to enter a home to execute an arrest warrant.[12]  But, this is not a "'rigid rule of announcement'"[13] as there are ""circumstances under which an unannounced entry is reasonable under the Fourth Amendment.""[14]  Thus, the Supreme Court "left to the lower courts the task of determining the circumstances under which an unannounced entry is reasonable under the Fourth Amendment."[15]

"Compliance with § 3109 may be excused only when exigent circumstances exist."[16]  "The term 'exigent circumstances,' in conjunction with the entry of a residence during the execution of a search warrant, refers to those situations where 'the officers believe there is an emergency situation and . . . their belief is

---

[11]  *Richards v. Wisconsin*, 520 U.S. 385, 387, 117 S.Ct. 1416 (1997) (citing *Wilson v. Arkansas*, 514 U.S. 927, 115 S.Ct. 1914 (1995)).

[12]  *See Miller v. U.S.*, 357 U.S. 301, 309, 78 S.Ct. 1190 (1958).

[13]  *Richards,* 520 U.S. at 387 (quoting *Wilson*, at 934).

[14]  *Id.* (quoting *Wilson*, at 936).

[15]  *U.S. v. Ramirez*, 523 U.S. 65, 70, 118 S.Ct. 992 (1998) (quotations and citation omitted).

[16]  *U.S. v. Knapp*, 1 F.3d 1026, 1030 (10th Cir. 1993).

objectively reasonable.'"[17]   The police "must have a reasonable
suspicion that knocking and announcing their presence, under the
particular circumstances, would be dangerous or futile, or that
it would inhibit the effective investigation of the crime by, for
example, allowing the destruction of evidence."[18]   "In reviewing
a challenge to the no-knock . . . execution of a search warrant,
[the court reviews] the execution from the perspective of
reasonable officers who are legitimately concerned not only with
doing their job, but with their own safety."[19]

      In reviewing the evidence, the court finds that the officers
entry into the trailer was justified by exigent circumstances.
The officers knew that Defendant was on probation, had an arrest
warrant involving the alleged possession of a firearm, and was
living with another probationer.  More importantly in the court's
mind, however, are the actions of the occupants inside the
trailer when the officers approached.  Agent Haurand heard
someone from inside the trailer yell "police" and then saw
presumably that same individual running toward the back of the
trailer.  Shortly thereafter, Haurand heard from one of the other
officers that things were flying out the back window.  Haurand
testified that based on his twenty years of experience he

_____

      [17]  *U.S. v. Stewart*, 867 F.2d 581, 584 (10th Cir. 1989)
(quoting *U.S. v. Spinelli*, 848 F.2d 26, 29 (2nd Cir. 1988)).

      [18]  *Richards*, 520 U.S. at 394.

      [19]  *U.S. v. Colonna*, 360 F.3d 1169, 1176 (10th Cir. 2004)
(citing *United States v. Myers*, 106 F.3d 936, 940 (10th Cir.
1997)).

realized that he needed to make immediate entry.  The court finds that Haurand's decision to enter was not based on some hunch or subjective factor[20] but on substantiated concerns about officer safety and the destruction of evidence.  Given the circumstances the court finds it highly unlikely that any occupants of the trailer would have answered the door promptly if the officers stopped on the doorstep and knocked.  Indeed, all this would have done is allow for more time to hide or destroy contraband.

The court finds this case is analogous to prior cases where the Tenth Circuit has upheld entry into a house without knocking, announcing, and waiting for occupants to answer the door.[21]  In this case there is no evidence that the officers knocked before entering.  But, given the exigent circumstances created by the occupants inside the trailer, the court finds knocking would have been futile.

Accordingly, the court finds that Agent Haurand's belief-that knocking, announcing the officer's presence and then waiting for entry would have been dangerous, futile or may have resulted in the destruction of evidence-to be reasonable.  The court further finds that the officer's knowledge of Defendant and his

---

[20]  *See U.S. v. Nielson, 415 F.3d 1195, 1200-01 (10th Cir. 2005)* (concluding that the police did not have sufficient justification for a no-knock warrant).

[21]  *See U.S. v. Mitchell, 783 F.2d 971, 973 (10th Cir. 1986)* (concluding entry into a home was justified when occupants moved away from the door after officers yelled police); *United States v. Baker, 638 f.2d 198, 202 (10th Cir. 1980)* (concluding immediate entry after knocking and announcing was justified where the officers heard scuffling from inside the residence which constituted exigent circumstances).

circumstances, along with the actions of the occupants within the
trailer, justified the no-knock entry into the trailer.

B. Search

    As noted *supra* Defendant shared a bedroom in the trailer
with Mrs. Blair's adult son.  Defendant argues that Mrs. Blair
did not have authority to consent to the search of Defendant's
room.  The court, however, finds it unnecessary to consider Mrs.
Blair's alleged consent.  Instead, the court looks to the
probation agreement and Blake Peterson's response to officer's
questions.

    A warrantless search of a probationers' residence may be
based upon reasonable suspicion.  "When an officer has reasonable
suspicion that a probationer subject to a search condition is
engaged in criminal activity, there is enough likelihood that
criminal conduct is occurring that an intrusion on the
probationer's significantly diminished privacy interests is
reasonable."[22]

    Stewart signed a probation agreement that permits AP&P
officers to "search my person, residence, vehicle or any other
property under my control without a warrant at any time, day or
night upon reasonable suspicion to ensure compliance with the
conditions of the Probation Agreement."[23]  The court finds that
Stewart was subject to a search at any time if officers had

---

[22]  *Knights*, 534 U.S. at 121.

[23]  *See* Probation Agreement, Pla.'s Ex. 1.

reasonable suspicion.[24]

In the instant case, when officers approached the trailer Blake Peterson drove away.  Later he returned and told the officers that there were firearms in the trailer and that as recently as a week earlier he had seen Defendant with a firearm.[25]  During testimony Defendant sought to distance himself from possessing the firearm.  In essence, Defendant argued that being seen with a firearm a week prior to the search does not provide reasonable suspicion.  The court disagrees.

Mr. Peterson did not only tell the officers that he had seen Defendant with a firearm but that he also saw firearms in the trailer.  Mr. Peterson did not qualify when he had seen firearms in the trailer.  Instead, based on the evidence it was reasonable for the officers to conclude that there were currently weapons inside the trailer, which is a clear violation of Stewart's probation agreement.  The officers searched Defendant's bedroom after they were told this information.  The court finds that Mr. Peterson's statements provided reasonable suspicion that Stewart was engaged in criminal activity.  The officers warrantless search, therefore, was justified.

---

[24]   *See* _Knights, 534 U.S. at 121_.

[25]   *See* Tr. 25-27.

## II.  Interviews With Agent Almgren

Next, the court turns to the interviews with Agent Almgren. At the outset, the court notes that there is no dispute regarding whether or not Stewart invoked his right to counsel.  It is also clear that Almgren was fully informed of this fact.  What is at issue, however, is whether or not Defendant initiated further communication with the police.  The Supreme Court has stated that an accused "having expressed his desire to deal with the police only through counsel, is not subject to further interrogations by the authorities until counsel has been made available to him, <u>unless</u> the accused himself initiates further communication, exchanges, or conversations with the police."[26]  Thus, if Stewart initiated the contact with police, Defendant's arguments fail and the statements must be admitted.

It is the Government's burden to show that Defendant knowingly and intelligently waived his *Miranda* rights before a subsequent interview.[27]  The Government points to *United States v. Obregon*,[28] in arguing that Defendant initiated the interviews. In *Obregon*, the defendant invoked his right to counsel.  Later, the defendant was approached by two agents who re-read him his *Miranda* rights to confirm that he understood them.  One agent

---

[26] *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880 (1981) (emphasis added).

[27] *See Oregon v. Bradshaw*, 462 U.S. 1039, 1044 103 S.Ct. 2830 (1983) ("[T]he burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.").

[28] 748 F.2d 1371 (10th Cir. 1984).

testified that she did not intend to take a statement from Obregon.  Instead, the agent sat down to explain an "Advice of Rights form"[29] which is used to help a defendant understand his rights.  At a certain point, the agent told the defendant that she was not going to ask any questions but just read the waiver to ensure that he did not feel something had been left out.  At that point the defendant asked what would happen to him if he helped the police and told the agent what she wanted to know.[30]  Obregon then started talking about the case and his involvement.  Based on this, the court held that Obregon initiated the conversation by asking what would happen to him.[31]  So the statements did not need to be suppressed.[32]

In the instant case, Agent Almgren conducted two interviews.  The first interview is surrounded by controversy.  According to the Government, the first interview arose from an alleged phone call by a guard at Defendant's request.  During testimony, however, Stewart fervently denied making any such request. And unfortunately for the Government, Almgren cannot identify the guard who allegedly called him.

The circumstances surrounding the second interview are not

---

[29]  *Id.* at 1378.

[30]  *See id.*

[31]  *See id.* 1380-81.

[32]  *See also Oregon v. Bradshaw, 462 U.S. 1039, 1045, 103 S.Ct. 2830 (1983)* (concluding that by asking "Well, what is going to happen to me now?" the defendant, who previously invoked his right to counsel, initiated further conversation with the police).

in dispute.  Stewart admitted he asked Almgren to return for the second interview.  Almgren also testified that he returned for the second interview at Stewart's request.  Almgren returned to followup on information Stewart asked Almgren to investigate, namely, Stewart's allegation that the gun belonged to another individual in the trailer.  Accordingly, any statements from the second interview should not be suppressed.

There is conflicting testimony before the court concerning whether or not Defendant requested the first interview. Defendant testified that he did not request anyone to come and talk to him initially.  And he did not fill out a request or ask an officer to do him a favor by calling Almgren.  But, Stewart does admit that he told Almgren he wanted to speak with the officers that were there the night he was arrested.

Almgren testified that prior to the first interview he told Defendant that he was there at Defendant's request and gave Defendant his *Miranda* warnings.  Stewart agreed to talk with him after waving those rights.

Based upon the evidence, and subtle inconsistencies in Stewart's testimony, the court finds the testimony offered by Defendant at the hearing not entirely credible.[33]  Regardless of Defendant's questionable credibility, the court finds that Stewart initiated further conversations with law enforcement by

---

[33]  *See United States v. Taverna*, 348 F.3d 873, 877 (10th Cir. 2003) ("At a hearing on a motion to suppress, the [magistrate] judge assesses the credibility of witnesses and determines the weight to be given to the evidence.").

telling Almgren that he wanted to speak with the arresting officers.  In the court's view it does not matter that Almgren was not one of the arresting officers because Stewart agreed to talk with Almgren after having this explained to him.  Stewart's willingness to talk with law enforcement was corroborated by both Stewart and Almgren during their testimony.  Stewart's statement appears even more indicative of an intent to initiate a conversation with police than if he were to have simply asked what is going to happen to me?[34]  Finally, the evidence indicates that prior to both interviews, Almgren read Defendant his *Miranda* rights.  And that both times Defendant knowingly and intelligently waived his rights before talking to Almgren.

Based on the foregoing, the court finds that the statements made by Stewart during the first interview need also not be suppressed because Defendant initiated the contact with law enforcement.

## RECOMMENDATION

Based on the foregoing:

It is HEREBY RECOMMENDED that Quentin Stewart's Motion to Suppress be DENIED.

Copies of the foregoing report and recommendation are being mailed to all parties who are hereby notified of their right to object.  The parties must file any objection to the Report and Recommendation within ten days after receiving it.  Failure to

---

[34]   *See* *Bradshaw, 462 U.S. 1039; Obregon, 748 F.2d 1371*.

object may constitute a waiver of objections upon subsequent
review.

DATED this  9th  day of May, 2006.

BY THE COURT:

BROOKE C. WELLS
United States Magistrate Judge